IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

JAMES CLIFFORD HANDS,
     Plaintiff,

vs.                             Case No.: 5:13cv363/MMP/EMT

CAROLYN W. COLVIN,
Acting Commissioner of the Social Security
Administration,
     Defendant.
_____/

## <u>REPORT AND RECOMMENDATION</u>

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court pertaining to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Acting Commissioner of the Social Security Administration ("the Commissioner of the SSA") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence and comport with proper legal principles.  The undersigned therefore recommends that the decision of the Commissioner be affirmed.

I.   PROCEDURAL HISTORY

On August 12, 2009, Plaintiff filed an application for DIB in which he alleged disability beginning August 5, 2009 (tr. 23).[1]  His application was denied initially and on reconsideration. Thereafter, Plaintiff requested a hearing before an administrative law judge ("ALJ").  The ALJ held a hearing on June 8, 2011, at which Plaintiff and a vocational expert ("VE") testified.  On July 13, 2011, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined under the Act, at any time through the date of his decision (tr. 23–30).  Plaintiff then sought review by the Appeals Council ("AC").  On August 29, 2013, after considering additional evidence submitted by Plaintiff and finding no basis to review the ALJ's decision, the AC denied Plaintiff's request for review (tr. 1–6).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

II.   FINDINGS OF THE ALJ

In his July 13, 2011, decision the ALJ made the following findings (tr. 23–30):

1)   Plaintiff meets the insured status requirements of the Act through December 31, 2014.[2]

2)   Plaintiff has not engaged in substantial gainful activity since his alleged onset date of August 5, 2009.

3)   Plaintiff has the following severe impairments: degenerative disc disease of the cervical spine, Behcet's syndrome,[3] and vision problems.

---

[1] All references to "tr." refer to the transcript of the SSA record filed on March 5, 2014 (doc. 12).  Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

[2] Thus, the time frame relevant to this appeal ("the relevant period") is August 5, 2009 (date of alleged onset) through July 13, 2011 (date of ALJ's decision).

[3] According to The Merck Manual, Behçet's disease

is chronic blood vessel inflammation (vasculitis) that can cause painful mouth sores, skin blisters, genital sores, and swollen joints.  The eyes, blood vessels, nervous system, and digestive tract may also become inflamed.

http://www.merckmanuals.com/home/bone_joint_and_muscle_disorders/vasculitic_disorders/beh%C3%A7et_diseas

Case No.: 5:13cv363/MMP/EMT

4)      Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5)      Plaintiff has the residual functional capacity ("RFC") to perform less than the full range of light work, as light work is defined in 20 C.F.R. §404.1567(b).[4]

6)      Plaintiff is capable of performing his past relevant work as a security guard, surveillance system monitor, jailer, and correctional officer, in the same manner in which he previously performed these positions.  This work does not require the performance of work related activities precluded by Plaintiff's RFC.

7)      Plaintiff has not been under a disability, as defined in the Act, from August 5, 2009, through the date of the ALJ's decision.

III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan,

---

e.html?qt=behcet&alt=sh (last visited Dec. 31, 2014).

[4] 20 C.F.R. § 404.1567(b) provides:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

In this case, the ALJ found that Plaintiff can lift/carry and push/pull ten pounds frequently and twenty pounds occasionally.  Plaintiff cannot climb ladders, rope, and scaffolds, but can climb ramps and stairs.  Plaintiff has no postural limitations.  Plaintiff should avoid exposure to hazards such as heights and machinery; concentrated exposure to environments of extreme heat, cold, wetness, humidity, vibration; and areas of fumes, odors, gases, poor ventilation, and humidity.  Plaintiff has no manipulative limitations.  He is able to sit for forty minutes before having to stand and relieve discomfort.  Plaintiff can stand for ten minutes before having to sit to relieve discomfort and can walk no more than fifty to sixty yards before having to rest due to fatigue (tr. 27).

125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998); Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.     If the claimant is performing substantial gainful activity, he is not disabled.

2.     If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.    PLAINTIFF'S PERSONAL, EMPLOYMENT, AND MEDICAL HISTORY[5]

A.     Personal and Employment History

Plaintiff was born on May 13, 1959, making him fifty years of age on his alleged disability onset date of August 5, 2009 (tr. 37).  He graduated from high school and by 2006 had completed two years of college (tr. 191).  The VE testified that Plaintiff's past relevant work as a correctional officer was skilled and light and that his work as a jailer was semi-skilled and light.[6]  Plaintiff also worked as a security guard/surveillance system monitor; the security guard job was classified as light semi-skilled work, and the surveillance system monitor job was classified as sedentary, unskilled work (tr. 67).

---

[5]  The Medical History section is largely derived from the references to the record contained in Plaintiff's memorandum, which references have been corrected and augmented by the court as warranted.

[6]  The VE testified that Plaintiff performed both of these positions at the sedentary level.

Plaintiff testified that for the past four years he had experienced headaches, dizziness, neck pain, oral and skin ulcers, fatigue, and skin that bruised and tore easily (tr. 47).  He also had ulcers on his eyelids which oozed a sticky substance, causing his vision to blur (tr. 48).  Plaintiff stated that he felt tired and weak all of the time (tr. 51).  According to Plaintiff, due to his symptoms he was unable to work (tr. 48, 56).

      B.        Evidence Before the ALJ

           1.        Records Dated Prior to Alleged Onset Date of August 5, 2009

In March 2008 Plaintiff was evaluated by rheumatologist Hulon E. Crayton, M.D. (tr. 254). Dr. Crayton noted that Plaintiff had generally been in good health until he began having problems with his gums and tongue following some dental work (*id.*).  Dr. Crayton suspected heavy metal poisoning, likely secondary to mercury exposure, rather than an autoimmune process (*id.*).

In October 2008 a periodontist referred Plaintiff to infectious disease specialist William D. Bone, M.D., to evaluate Plaintiff's recurrent symptoms of eye, oral, and genital ulcers which had been non-responsive to treatment with antibiotics, anti-virals, and anti-inflammatory medications (tr. 308).  In the "History of Present Illness" section of his reports, Dr. Bone consistently noted that Plaintiff complained of difficulty eating due to mouth ulcers and resulting mild weight loss (*see* tr. 285–99).  Dr. Bone's physical findings, as reflected in the "Review of Systems" section of his reports, generally were unremarkable, and Plaintiff denied having any other symptoms (*id.*).  From December 2008 through July 2009, on approximately a monthly basis, Dr. Bone diagnosed Plaintiff with Behcet's disease, for which he prescribed prednisolone and other medications (tr. 288, 290, 292, 294, 303, 305, 307).  Dr. Bone also noted a diagnosis of arsenic poisoning in his July 2009 report (tr. 286, 301).

While being treated by Dr. Bone, Plaintiff was also seen at the Gulf County Health Department.  In January 2009, Kevin Murphy, M.D., noted the presence of multiple ulcers in Plaintiff's oral and genital areas that were of unknown etiology but presumed to be microangiopathic angitis (tr. 239).[7]  Dr. Murphy ordered a biopsy of a lesion in the perianal area, the report of which

---

[7] Although Dr. Murphy's handwritten notes are, in places, largely illegible, the court has made its best effort to decipher them.

biopsy noted that "[t]he histological differential diagnosis, in consideration of the clinical history, is most consistent with Behcet's disease" (tr.  244).   Other, less likely diagnoses included Sweet's syndrome or pyoderma gangrenosum (*id.*).   Cervical spine x-rays taken in January 2009 revealed degenerative disc disease and degenerative changes in Plaintiff's lower cervical spine (tr. 251). Based on lab work he reviewed in February 2009, Dr. Murphy noted his impressions of Behcet's disease, "pre-diabetes" Type II, and increased lipids (tr. 348).   In January 2009 and February 2009 Plaintiff reported that he was experiencing little or no pain (tr. 343).   Plaintiff was a "no show" for a lab appointment in March 2009 (tr. 348).

In June 2009, upon referral by Dr. Bone, Plaintiff was again seen by Dr. Crayton (tr. 253, 288).   Dr. Crayton noted Plaintiff's complaints of recurrent oral and genital ulcers and his previous diagnosis of heavy metal poisoning related to dental fillings (tr. 253).   Dr. Crayton's assessment was "Behcet's syndrome versus arsenic and mercury poisoning as previously diagnosed by me in 3/08" (*id.*).   Dr. Crayton recommended retesting Plaintiff's arsenic and mercury levels and to have the metal dental fillings removed; if there was no response, treatment for autoimmune disorder should be considered (*id.*).   Subsequent urine test results revealed high arsenic levels; Dr. Crayton therefore advised Plaintiff to have his dental fillings removed immediately (tr. 255).

2.      Records Dated After Alleged Onset Date of August 5, 2009

Plaintiff returned to the Gulf County Health Department in October 2009 complaining of back, neck, and mouth pain and redness in the left eye (tr. 348).   The record reflects that Plaintiff was being seen at the Eye Center for his eye symptoms (tr. 347) and had been dropped by Dr. Bone as a patient due to non-compliance with treatment (*id.*).   The report of a physical examination noted the presence of iritis, uveitis, aphthous [mouth] ulcers, and extremity lesions (tr. 347).   Plaintiff was assessed with hyperlipedemia, diabetes mellitus Type II, and Behcet's disease (*id.*).   Plaintiff reported that his pain level was "8," on a scale of 1 to 10, with 10 being the most severe pain (tr. 343).   He was offered pain medication but refused it (tr. 346).   Clinical notes from a November 2009 visit reflect that Plaintiff's laboratory test results were within normal limits, that he had recently stopped working, and that he was applying for Social Security benefits (tr. 344–45).   Plaintiff again

reported having a pain level of "8" (tr. 343) and was written a prescription for Darvocet (tr. 344).[8]
Dr. Murphy's impression was Behcet's disease; he noted the appearance of new penile lesions, for
which he prescribed topical and oral medications, and he recommended that Plaintiff see a
rheumatologist (*id.*).

In a Report of Contact with a Disability Determinations representative dated January 23,
2010, Plaintiff cited ongoing stomach and headache pain which he treated with over-the-counter
medications and/or rest; the Report also notes that Plaintiff was on multiple medications for Behcet's
disease.  Plaintiff reported to the representative that had no lesions at that time (tr. 205).  Plaintiff
also indicated that Dr. Bone had discharged him as a patient, and he acknowledged that he had been
non-compliant with prescribed medications (*id.*).  Plaintiff stated that he was able to drive and
visualize road signs, warnings, and signalization.  He wore glasses to read and was able to read
directions, instructions, and labels (*id.*).  He reported he was also able to prepare simple meals,
perform routine household chores, shop, and manage his own finances (*id.*).

In February 2010, Clarence Louis, M.D., a medical consultant for the Commissioner,
evaluated Plaintiff's medical records (tr. 350–57).[9]  Dr. Louis noted Plaintiff's primary diagnosis of
Behcet's disease and history of diabetes (tr. 350).  He opined that Plaintiff could lift twenty pounds
occasionally and ten pounds frequently (tr. 351).  Plaintiff could stand and/or walk for a total of
about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday,
and push and/or pull without restriction; he had no postural, manipulative, visual, or communicative
limitations (tr. 351–54).  According to Dr. Louis, Plaintiff should avoid concentrated exposure to
extreme temperatures, wetness, humidity, vibration, pulmonary irritants, and hazards (tr. 354).

--------

[8]  Darvocet, a combination of propoxyphene and acetaminophen, is prescribed to relieve mild to moderate pain.
http://www.drugs.com/darvocet.html (last visited Dec. 31, 2014).  Darvocet is no longer available, as all propoxyphene
containing products were withdrawn from the U.S. market, in November 2010 because of the risk of serious heart-related
side effects.  http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm234350.htm (last visited Dec. 31,
2014).

[9]  Dr. Louis stated that he contacted a nurse at the Gulf County Health Department due to his difficulty reading
the handwritten clinical notes (tr. 357).  The nurse advised that Plaintiff had been advised repeatedly to maintain
compliance with recommended treatment but had failed to do so; according to the nurse, had Plaintiff been compliant
with prescribed medications and cream the ulcers in his mouth and on his penis would have resolved in five to seven days
(*id.*).  She also reported that Plaintiff's medical records did not reflect complaints of severe weakness or fatigue.

Dr. Murphy saw Plaintiff again in March 2010, when he noted ulcers of the hard palate and penis; his impressions included Behcet's disease, and he referred Plaintiff to the Mayo Clinic for further evaluation (tr. 385–86).

In May 2010, Dr. Kenneth T. Calamia, a rheumatologist at the Mayo Clinic, Jacksonville, Florida, evaluated Plaintiff for participation in a study on Behcet's disease (tr. 358).  Outlining Plaintiff's medical history, Dr. Calamia noted that Plaintiff had been diagnosed with Behcet's disease in 2008, subsequent to the placement of metal dental fillings (tr. 359).[10]  Dr. Calamia noted that Plaintiff's initial symptoms included swelling of the mouth, gums, and tongue; mouth ulcerations; nosebleeds; and eye irritation, blurring, oozing, and redness (id.).  Later, Plaintiff's symptoms included chronic ocular irritation; chronic mouth ulcerations (some of the ulcers near Plaintiff's teeth improved after his fillings and seven teeth were removed but Plaintiff continued to experience chronic ulcers in his mouth, especially on the hard palate); genital ulcers, including chronic scrotal ulcerative lesions and chronic lesions of the glans penis; buttock and perineal lesions; several chronic ulcerating lesions of the lower legs, ankles, and upper extremities which generally improved when treated with prednisolone; and recurring abdominal pain associated with constipation (tr. 359–60).  It was further noted that a colonoscopic examination had found lesions and that Plaintiff experienced neck, head, and knee pain; episodic sweating; heaviness; and a feeling of weakness two to three times daily (tr. 360).

On physical examination, Dr. Calamia found evidence of mild conjunctivitis; a chronic, fairly shallow ulceration of the hard palate and other oral ulcers; chronic ulcer of the scrotum and ulcerations of the glans penis; areas of hyperpigmentation of the skin at the sites of previous ulcers; an active ulcer on the right ankles; and other healed lesions (tr. 361).  Plaintiff also had a current infection of the left great toe, with symptoms suggesting cellulitis (id.).  Dr. Calamia's impression was recurring aphthous stomatitis with chronic ulcerations of the mouth/hard palate; chronic

---

[10]  Dr. Calamia did not identify the source of Plaintiff's medical history, i.e., whether it came from Plaintiff's medical records or was self-reported or both.  Although the precise medical records are not referenced, given the reference to certain test results, treatment, etc., it appears to have been a combination of both sources, including records from Gulf County Health Department (see doc. 385, noting that Plaintiff's records had been copied and mailed, presumably to Dr. Calamia).

ulcerations of the scrotum, likely part of the cutaneous process; ulcerations of the glans penis; and scattered ulcerations, especially of the lower legs, with nonspecific biopsy results in the past (*id.*). According to Dr. Calamia, Plaintiff's age at the onset of his symptoms and the chronicity of the physical findings "point[ed] away from Behcet's disease.  [Plaintiff's description of] easy tearing of skin at times including the mouth and the onset of the skin lesions with blisters suggest[s] a process in the spectrum of pemphigus or pemphigoid."[11] (tr. 362).  Dr. Calamia  could not confirm a diagnosis of Behcet's syndrome,  and he recommended treatment with a trial of colchicine[12] as well as further evaluation to diagnose Plaintiff's condition (tr. 358).

Plaintiff's records from the Gulf County Health Department for May 2010 reflect prescriptions for Darvocet (tr. 385).  In June 2010 Dr. Murphy noted that Plaintiff's diagnosis of Behcet's disease was in doubt (tr. 384).  Dr. Murphy's recommendations included obtaining another consultative opinion and the use of colchicine (*id.*).  In July 2010 Dr. Murphy's impressions were autoimmune disease of unknown etiology, chronic infected wound of the right great toe, and possible diverticulitis (tr. 383).  In October 2010 Plaintiff's Gulf County Health Department records reflect Plaintiff's complaints of neck pain and stiffness, joint pain in the fingers and legs that had worsened in recent months, tiredness and weakness, and abdominal discomfort that had recently worsened (tr. 382).  Dr. Murphy's impressions included possible diverticulitis, constipation, autoimmune disease, recurrent mouth ulcers, and diabetes mellitus (tr. 381).  In January 2011 Plaintiff complained of neck and back stiffness, and joint pain—including finger joint pain—at a follow-up visit (*id.*).  Plaintiff reported that, for financial reasons, he had not obtained colchicine or undergone recommended blood work; he also had received no follow-up at the Mayo Clinic since his May 2010 visit.  Dr. Murphy noted recurrent abdominal pain that had not responded to treatment, possible Behcet's disease, and possible gout; he recommended that Plaintiff take colchicine, undergo blood work and a

---

[11]  Pemphigus is a group of rare autoimmune diseases that cause blistering of the skin and mucous membranes (mouth, nose, throat, eyes, and genitals).  Pemphigoid is also a blistering disorder caused by autoimmune problems that result in an attack on the skin cells by a person's own antibodies.  *See* http://www.niams.nih.gov/Health_Info/Pemphigus (last visited Dec. 31, 2014).

[12]  Colchicine is "an anti-inflammatory medication commonly used to treat gout."  *See* http://www.niams.nih.gov/Health_Info/Autoinflammatory (last visited Dec. 31, 2014).

computerized tomography ("CT") scan, and be referred for further evaluation (tr. 380). In February 2011 Dr. Murphy noted that the CT scan of Plaintiff's abdomen and pelvis was essentially unremarkable except for some thickening of the colon; based on that finding, a diagnosis of colitis could not be excluded (tr. 379). In June 2011, magnetic resonance imaging ("MRI") of Plaintiff's cervical spine revealed mild multi-level degenerative disc disease with mild disc bulges and no acute process (tr. 387).

      C.      Evidence Before the Appeals Council

In February 2012, or approximately seven months after the ALJ issued his July 2011 decision, Plaintiff was seen by Aymen A. Kenawy, M.D., at Emerald Coast Rheumatology, for evaluation and management of Behcet's disease (tr. 401–14). Dr. Kenawy noted Plaintiff's medical history, which included bleeding gums; oral, genital, and rectal ulcers; nose bleeds; and neck and back stiffness after Plaintiff had some dental work performed in 2007 (tr. 401). Plaintiff had suffered from genital ulcers for over four years. Plaintiff had been diagnosed with metal poisoning and, based on a skin biopsy, Behcet's disease (*id.*). Treatment with prednisolone for four months did not improve Plaintiff's condition but rather worsened it, and treatment with colchicine did not help him either (*id.*). Plaintiff reported severe fatigue and skin lesions, and a pain level of "7"; Dr. Kenawy noted a questionable history of eye disease (*id.*). Dr. Kenawy's physical examination of Plaintiff mostly revealed unremarkable findings, other than ulcerations along the shaft of the penis and the right leg (tr. 403). Although at the time his assessment was Behcet's disease, Dr. Kenawy opined that Plaintiff's overall clinical picture was not consistent with this condition, and he recommended a repeated skin biopsy to help determine the diagnosis (*id.*). Dr. Kenawy also ordered a battery of blood tests to assess the presence of Behcet's disease, as well as other tests to assess Plaintiff's reported malaise and fatigue; Dr. Kenawy also prescribed Lyrica for idiopathic peripheral autonomic neuropathy, unspecified (tr. 404).

At Plaintiff's next visit, in March 2012, Plaintiff reported to Dr. Kenawy that he had experienced little improvement of his pain using Lyrica, that he continued to experience constant neck pain and headaches, and that he suffered severe fatigue and skin lesions; among other things,

he denied experiencing fever, skin rashes, or arthritis (tr. 396).[13]  The report of Plaintiff's physical examination was similar to his February 2012 visit (tr. 400).  Dr. Kenawy also noted that the extensive laboratory tests had been within normal limits (tr. 401).  He opined that the overall clinical picture was not suggestive of Behcet's disease, but stated that a skin biopsy should be taken to help determine the diagnosis (*id.*).  A neurology consultation was advised for Plaintiff's reports of occipital neuralgia, Lyrica was continued for his idiopathic peripheral autonomic neuropathy, and he was advised to take vitamins for an unspecified vitamin D deficiency (*id.*).

Dr. Kenawy saw Plaintiff again in April 2012, when he again noted a generally unremarkable physical examination (tr. 393–95).  Dr. Kenawy opined that he did not believe Plaintiff suffered from Behcet's disease (tr. 395); in his view, the fact that Plaintiff's symptoms did not improve but in fact worsened with corticosteroid treatment argued against true rheumatic disease (*id.*).  He also suggested that Plaintiff return to see Dr. Calamia (*id.*).  The April 3, 2012, dermatopathology report of a biopsy of the right leg indicated the abnormal tissue was most consistent with a diagnosis of neutrophilic dermatosis such as pyoderma gangrenosa (tr. 390).

On May 11, 2012, Julian Freeman, M.D., a specialist in internal medicine and neurology, reviewed Plaintiff's medical records at the request of his attorney and wrote a non-examining medical opinion (tr. 415–19).  Dr. Freeman concluded that Plaintiff's medical records—including the biopsy reports and lack of certain clinical findings usually associated with Behcet's disease and Sweeting's disease—provided confirmation of two of the diagnoses from January 2009, microangiopathic vasculitis and pyoderma gangrenosa (tr. 416).  He noted that microangiopathic vasculitis is usually considered to be the underlying process in pyoderma gangrenosa even though it is listed as a separate diagnosis (*id.*).  According to Dr. Freeman, even if pyoderma gangrenosa were Plaintiff's ultimate diagnosis, it should be categorized as atypical due to some deviation from findings that are usually found with that condition (*id.*).  Dr. Freeman thought Plaintiff's condition would be classified as an undifferentiated connective tissue disease with vasculitic characteristics, even though the autoimmune tests were negative for the usual causes and conditions (*id.*).

---

[13]  Elsewhere in the report, however, Plaintiff is said to have reported having fever and not having any fatigue (*see* tr. 397).

Dr. Freeman then compared Plaintiff's condition to the SSA's listed impairments (tr. 416). He opined that Plaintiff had met the criteria of Listing 8.05 since 2006, and the criteria of Listings 14.03 and 14.06 since approximately January 2010 (tr. 417). According to Dr. Freeman, Plaintiff's condition met Listing 8.05 "because whatever the underlying diagnosis might be, a chronic dermatitis is present," and "it involved the genital and perineal area with interference with use of clothing and posture due to pain and irritation, and wearing of socks and shoes due to the lower extremity ulceration." (tr. 416–17). Dr. Freeman concluded that, based on Plaintiff's reported medical history, the condition had been present and unresponsive to treatment since the fall of 2006, and it had been demonstrated in clinical findings since early 2010 (tr. 417). Thus Listing 8.05 had "been met since 9/2006 by medical inference, with worsening in early 2010 per the clinical notes that begin in that time frame" (*id.*).

Dr. Freeman further opined that Listings 14.03 and 14.06 were relevant due to Plaintiff's condition, which was correctly identified as microangiopathic vasculitis (and the "crossover" to undifferentiated connective tissue disease) (tr. 417). According to Dr. Freeman,

> multisystem involvement historically was present since 2006 with eye and skin involvement, both at least at a moderate level, with later musculoskeletal (joint), intestinal, muscle, and hemotologic (neutropoenia) involvement. The medical record from the Mayo Clinic is quite explicit regarding the presence of severe fatigue, severe malaise, and unexplained fevers by 2010. The severity of these symptoms prior to that date is less clear.
>
> As a result, listing 14.03.A is met at least 1/1/10 through the current date, with 14.06 met somewhat later.

(*id.*).

Dr. Freeman also addressed Plaintiff's residual functional capacity. He concluded that Plaintiff's ulcers on his genitals, anal area, and legs would have precluded wearing clothing in a normal work environment since at least late 2009 and have caused significant problems since 2006 (tr. 417). Additionally, Plaintiff's pain, malaise, and fatigue had been severe since at least 2009 and precluded his ability to sustain a normal six to eight-hour workday (*id.*). Concluding, Dr. Freeman stated that technically Plaintiff had satisfied a Listing since 2006 even though he continued to work, that he had suffered further deterioration in late 2009, and that his condition had become marked by

January 2010 (*id.*).  He explained that "[p]yoderma gangrenosa, not uncommonly, is associated with both diabetes and ulcerative colitis or incompletely defined bowel disease" and that "both diabetes and inflammatory bowel disease have appeared at a later date in this individual," which possibly suggested a "fundamental, causal relationship." (*id.*).

V.     DISCUSSION

Plaintiff first argues that at step three of the sequential analysis it was error for the AC to reject Dr. Freeman's opinion that Plaintiff met the criteria of Listings 8.05, 14.03, and 14.06 (doc. 26 at 8).

The fourth sentence of § 405(g), which is applicable in this instance, provides federal courts with the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  A sentence four remand may be appropriate when the claimant submits new evidence to the AC which the AC did not adequately consider in denying the claimant's request for review.  Ingram, 496 F.3d at 1261.  With respect to this type of remand, it must be established that, in light of the new evidence submitted to the AC, the ALJ's decision to deny benefits is not supported by substantial evidence in the record as a whole.  *Id.* at 1266–67; *see also* 20 C.F.R. 404.970(b) (the AC must consider new, material, and chronologically relevant evidence and must review the case if the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record").  New evidence submitted by a claimant to the AC must relate to the period on or before the date of the ALJ's decision.  *See* Wilson v. Apfel, 179 F.3d 1276, 1279 (11th Cir. 1999); 20 C.F.R. § 404.970(b) (requiring AC to consider new evidence "only where it relates to the period on or before the date of the administrative law judge hearing decision").  A sentence-four remand is unwarranted if there is no "reasonable possibility that [the new evidence] would change the administrative result."  Milano v. Bowen, 809 F.2d 763, 766 (11th Cir. 1987).

Dr. Freeman's opinion was rendered about ten months after the ALJ issued his decision on July 13, 2011, and it discusses Dr. Freeman's view of Plaintiff's symptoms, diagnoses, and limitations during the relevant period of August 5, 2009, through July 13, 2011.  Thus, as the Commissioner does not appear to dispute, Dr. Freeman's May 11, 2012, opinion constitutes new,

material, and chronologically relevant evidence.  Nevertheless, although the AC properly considered Dr. Freeman's report (*see* tr. 1, 4), the court concludes the AC was not required to review Plaintiff's case based on that opinion because the ALJ's decision was not contrary to the weight of the record evidence.  As explained below, the court finds there is no reasonable possibility that the opinions expressed in Dr. Freeman's report would change the administrative result.

The court first notes that under the controlling regulations the final responsibility for deciding the ultimate issue of whether a social security claimant is "disabled" or "unable to work" is reserved to the Commissioner.  20 C.F.R. § 416.927(e)(1) (internal quotation marks omitted).  Consequently, the Commissioner is not bound even by a treating physician's opinion on the ultimate issue of disability, *id.*, and such opinions are never entitled to controlling weight or special significance.  *See* Social Security Ruling 96–5p, 1996 WL 374183 (July 2, 1996).  Thus the disability opinion of Dr. Freeman, who is not a treating physician or even an examining physician but rather only a consulting physician, is not entitled to controlling weight.  Nevertheless, opinions from any medical source on issues reserved to the Commissioner may not be ignored.  Rather, the Commissioner must evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner to determine the extent to which the opinion is supported by the record.

At step three of the sequential disability evaluation, the Commissioner compares a claimant's impairments with those found in "The Listing of Impairments" ("the Listings").  *See* 20 C.F.R. § 404.1525,  20 C.F.R. § 404, Subpart P, Appendix 1.  The Listings describe specific impairments of each of the major body systems, which impairments are considered "severe enough to prevent a person from doing any gainful activity, regardless of his or her age, education, or work experience." *See* 20 C.F.R. § 404.1520(d);  Sullivan v. Zebley, 493 U.S. 521, 532, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990).  The claimant has the burden of proving that an impairment meets or equals a listed impairment.  Barron v. Sullivan, 924 F.2d 227, 229 (11th Cir. 1991).  He must have a diagnosis included in the Listings, and he must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement.  *See* 20 C.F.R. §§ 404.1525(a)–(e). Medical findings must be "at least equal in severity and duration to the listed findings" in order to

establish that a condition "equals" a listed impairment.  *See id.* § 404.1526(a).  "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Zebley, 493 U.S. at 530.

The court first considers Dr. Freeman's opinion that Plaintiff satisfied the criteria of Listings 14.03 and 14.06 during the relevant period.  The ALJ did not consider Plaintiff's symptoms under Listing 14.06, but he did consider them under Listing 14.03, and the requirements for both of these Listings are similar.[14]  Listing 14.00 pertains to Immune System Disorders.  More particularly, Listing 14.03 addresses Systemic vasculitis, *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§14.00D2 and 14.03, and Listing 14.06 addresses Undifferentiated and mixed connective tissue disease.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 14.00D5 and 14.06.  To meet either Listing 14.03 or 14.06, a claimant must demonstrate there is involvement of two or more organs/body systems with one or more of the organs/body systems involved to at least a moderate level of severity and at least two constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss), OR repeated manifestations of the condition with at least two of the constitutional signs or symptoms and one of the following at the "marked" level: activities of daily living; maintaining social functioning; or completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 14.03, 14.06.

The ALJ found that Plaintiff had not satisfied the requirements of Listing 14.03, stating that the objective evidence showed no marked limitation of activities of daily living, maintaining social

---

[14]   The ALJ also considered Plaintiff's symptoms under Listing 14.09, Inflammatory arthritis, which Listing specifically includes Behcet's disease.  The ALJ noted that in order to satisfy Listing 14.09 a claimant must show a persistent inflammation or persistent deformity of one or more major peripheral weight-bearing joints resulting in the inability to ambulate effectively or one or more major peripheral joints in each upper extremity resulting in the inability to perform fine and gross movement effectively OR inflammation or deformity in one or more major peripheral joints involving two or more organs/body systems with one of the organ/body systems involving at least to a moderate level of severity and at least two of the constitutional symptoms or signs, OR ankylosing spondylitis or other spondyloarthropathies (*see* tr. 26; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §14.09).  Citing the reports of Drs. Murphy, Calamia, and Louis, the ALJ concluded that the objective medical evidence did not show that the criteria of Listing 14.09 had been satisfied (tr. 26–27).  Plaintiff does not challenge this finding by the ALJ.  Nor does Plaintiff challenge the ALJ's conclusion that his symptoms did not satisfy the requirements of Listing 1.04, Disorders of the spine, or Listing 2.02, Loss of central visual acuity.

functioning, or completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.  According to the ALJ,

> Despite his impairments the claimant is able to prepare meals, watch television, perform routine household chores, [and] drive and visualize and read road signs, warnings and signalizations (Exhibit 9E), which require sustained concentration (Exhibit SE).  Therefore, because the objective medical evidence does not indicate a marked level on limitations of activities of daily living, maintaining social functioning or completing tasks in a timely manner due to deficiencies in concentration, persistence or pace, the criteria under 14.03 have not been met.

(tr. 27).

The ALJ's conclusion, which applies equally to Listing 14.06, is supported by substantial evidence and is unaltered by the new evidence supplied to the AC.  Other than simply pointing to Dr. Freeman's opinion, Plaintiff has not argued or shown that during the relevant period he experienced a marked restriction of his ability to perform activities of daily living, maintain social functioning, or complete tasks in a timely manner due to deficiencies in concentration, persistence, or pace.  Plaintiff has not identified any medical evidence of record that supports such restrictions nor has the court located any.

The ALJ did not discuss whether one or more of Plaintiff's organs/body systems were involved to at least a moderate level of severity and whether he displayed at least two constitutional symptoms or signs, such as severe fatigue, fever, malaise, or involuntary weight loss, as Listings 14.03 and 14.06 also provide.  As outlined above, however, although there are a few references during the relevant period to Plaintiff's complaints of feeling tired or weak (*see* tr. 360,  382), the medical evidence from Drs. Murphy, Bone, and Calamia that was before the ALJ does not appear to mention a *severe* level of fatigue, fever, malaise, or involuntary weight loss.  As noted, the relevant Listings require that the degree of the constitutional signs or symptoms be severe.  Also, although Plaintiff at times during the relevant period reported having pain (*see, e.g.*, tr. 343, 348, 360, 381, 382), he was only prescribed medication used for mild to moderate pain (*see, e.g.,* tr. 344,

385), declined pain medication (tr. 346), or reported that he treated his stomach and headache pain with over-the-counter medications and/or rest (tr. 205).[15]

For the above reasons, this court concludes it was not error for the AC to refuse to review the ALJ's decision based on Dr. Freeman's opinion that Plaintiff met Listings 14.03 or 14.06, as there was no reasonable possibility the opinion would have altered the ALJ's decision.

Plaintiff also relies on Dr. Freeman's opinion that Plaintiff satisfies Listing 8.05, Dermatitis. To meet the criteria of this Listing, a claimant must have "dermatitis (for example, psoriasis, dyshidrosis, atopic dermatitis, exfoliative dermatitis, allergic contact dermatitis), with extensive skin lesions that persist for at least three months despite continuing treatment as prescribed." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 8.05. "Extensive skin lesions" are "those that involve multiple body sites or critical body areas, and result in a very serious limitation." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 8.00C(1). Such lesions may include those that interfere with the motion of joints, or lesions on the palms of both hands, the soles of both feet, the perineum, or both inguinal areas that very seriously limit the ability to ambulate. *Id.*

The ALJ did not discuss Listing 8.05. The ALJ did, however, consider whether the medical evidence showed Plaintiff suffered from any serious limitation, a requirement of Listing 8.05, and he concluded it did not (*see supra,* citing tr. 27). As discussed above, the record evidence supports the ALJ's finding. The ALJ also noted references in the record to Plaintiff's admitted non-compliance with treatment (tr. 28), and the lack of mention of any inability to ambulate effectively (tr. 27). Moreover, Plaintiff points to nothing in the medical record—and the court is aware of nothing—that states Plaintiff's skin ulcers so interfered with his wearing clothing and shoes that his ability to work was compromised or that pain and fatigue prevented him from working a normal workday. There appears to be no recommendation or opinion in the medical record from any treating physician or source so indicating. For the foregoing reasons, the court concludes it was not error for

---

[15]   Plaintiff does not appear to rely directly on Dr. Kenawy's records. Nevertheless, the court notes that while Dr. Kenawy's records from February to April 2012 that were before the AC (but not the ALJ) reflect reports of pain, malaise and fatigue, and perhaps fever, the degree of severity is not assessed nor is the duration or time frame of any such signs and symptoms noted. Thus Dr. Kenawy's records provide no documentation showing that Plaintiff experienced the requisite signs and symptoms, and the necessary degree of severity during the relevant period.

the AC to refuse to review the ALJ's decision based on Dr. Freeman's opinion that Plaintiff met Listing 8.05 because there was no reasonable possibility that this opinion would have altered the ALJ's decision.

In sum, the court is satisfied that even in light of the new evidence submitted to the AC, the ALJ's decision to deny benefits is supported by substantial evidence.  As there is no reasonable possibility that Dr. Freeman's opinion, or the new medical records from Dr. Kenawy, would change the administrative result, Plaintiff's first ground for relief fails.  This conclusion effectively also disposes of Plaintiff's second ground for relief, in which he argues that the AC "erred in rejecting the opinion of reviewing physician Dr. Freeman that Plaintiff has additional severe impairments related to his skin disorder, pain, malaise, and fatigue that have precluded the ability to wear clothing in normal work environments and the ability to sustain a normal six to eight hour work day since 2009" (doc. 26 at 10).  As discussed above, the AC did not err in rejecting Dr. Freeman's report.  Accordingly, the court concludes that Plaintiff has not shown how the outcome of this case would be different had the ALJ—based on Dr. Freeman's opinion—identified additional impairments as severe or included them in Plaintiff's RFC assessment.

In any event, the court perceives no error by the ALJ in making his step two determination or, consequently, by the AC in reviewing that determination.  After making his step-two finding, the ALJ continued with the sequential analysis, which is all that is required at step two.  "[T]he finding of *any* severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two."  Jamison v. Bowen, 814 F.2d 585, 588 (11th Cir. 1987) (emphasis added).  "[N]othing requires that the ALJ must identify at step two, all of the impairments that should be considered severe.  Instead, at step three, the ALJ is required to demonstrate that [he] has considered all of claimant's impairments, whether severe or not, in combination."  Heatly v. Comm'r of Soc. Sec., 382 F. App'x 823, 824–25 (11th Cir. 2010).  Here, the ALJ did so, including providing a thorough discussion of Plaintiff's symptoms under Listings 1.04, 2.02, 14.03, and 14.09 (*see* tr. 26–27).  There was no error in connection with the step two determination, either by the ALJ or by the AC in considering this finding.

Moreover, the court sees no error by either the ALJ or the AC with respect to Plaintiff's RFC assessment.  The ALJ discussed Plaintiff's impairments in formulating his RFC (tr. 27–29), and he included limitations caused by the impairments in the hypothetical question posed to the VE (tr. 67–68).  In addition to other functional limitations (*see* n.4, *supra*), the ALJ restricted Plaintiff to sitting only forty minutes before having to stand and relieve discomfort, standing only ten minutes before having to sit to relieve discomfort, and walking no more than fifty to sixty yards before having to rest due to fatigue (tr. 27).  To the extent the impairments of pain, malaise, and fatigue were reported and documented in Plaintiff's medical records for the relevant period, they are adequately accounted for by these restrictions.  Also, there appears to be nothing in Plaintiff's medical records for the relevant period that supports Dr. Freeman's view that Plaintiff's skin condition prevented Plaintiff from wearing clothing in a normal work environment or that pain and fatigue prevented him from working a six to eight-hour day.  And, as discussed previously, Dr. Freeman's opinion concerning the severity of these impairments for the relevant period is not supported by the medical record. Accordingly, for the foregoing reasons, the court finds no merit in Plaintiff's second ground for relief, which is based on step two of the sequential analysis and the ALJ's RFC determination.

Plaintiff's third and final ground for reversal and remand is that the ALJ erred in making his credibility determination.  Plaintiff argues that the ALJ failed to adequately consider whether his underlying medically determinable impairments were reasonably related to his allegations of pain and limitations.  According to Plaintiff, the ALJ's reliance on his alleged non-compliance with prescribed treatment was an insufficient reason for discounting his credibility.

The court is satisfied the ALJ did not err in discounting the credibility of Plaintiff's testimony when he found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (tr. 29).  In Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991), the Eleventh Circuit articulated the "pain standard," which applies when a disability claimant attempts to establish a disability through his own testimony of pain or other subjective symptoms.  The pain standard requires: (1) evidence of an underlying medical condition and either

(a) objective medical evidence that confirms the severity of the alleged pain arising from that condition, or (b) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. Holt, 921 F.2d at 1223 (internal citation omitted). If a claimant testifies as to his subjective complaints of disabling pain and other symptoms, as Plaintiff did here, the ALJ must clearly "articulate explicit and adequate reasons" for discrediting the claimant's allegations of completely disabling symptoms. Foote, 67 F.3d at 1561–62. Additionally, "'[a]lthough this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.'" Id. at 1562 (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)). The credibility determination does not need to cite "'particular phrases or formulations'" but it cannot merely be a broad rejection which is "'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [his] medical condition as a whole.'" Id. (quoting Jamison, 814 F.2d at 588–90).

Here, the ALJ identified the correct pain standard (see tr. 28–29) before articulating his reasons for discounting Plaintiff's credibility. Although not mentioned by Plaintiff, in addition to noting Plaintiff's non-compliance with treatment—a finding which is supported by the record (see tr. 205, 206, 347, 357)—the ALJ found that the objective medical evidence did not substantiate Plaintiff's allegations of disability. This finding too is supported by the medical record, which the ALJ adequately discussed in his decision (tr. 26–29), and the court has outlined above. Also, the ALJ noted that in February 2010 Dr. Louis had reviewed the medical record and found that, even with his alleged impairments, Plaintiff retained the ability to perform a modified range of light work (tr. 29). Additionally, the ALJ observed that Plaintiff's daily activities, including the ability to prepare simple meals, perform routine household tasks, and operate a car, were inconsistent with the severity of his subjective complaints (tr. 28–29). As the record substantially supports the ALJ's reasons for finding Plaintiff less than fully credible, the court cannot conclude the ALJ erred in making his credibility determination. See Foote, 67 F.3d at 1562 (a clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court); MacGregor, 786 F.2d at 1054 (same). This ground for relief therefore fails.

VI.    CONCLUSION

For the foregoing reasons, the undersigned concludes that the Commissioner's decision is supported by substantial evidence and should not be disturbed.  42 U.S.C. § 405(g); <u>Lewis</u>, 125 F. 3d at 1439; <u>Foote</u>, 67 F.3d at1560.  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it respectfully **RECOMMENDED**:

That the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this <u>6th</u> day of January 2015.


**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


**<u>NOTICE TO THE PARTIES</u>**

**Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**